RECEIVED
IN ALEXANDRIA, LA.
JUN - 4 2014
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| CHRISTUS HEALTH SOUTHWESTERN LOUISIANA | : | DOCKET NO. 2:11-1334 |
| VS. | : | JUDGE TRIMBLE |
| GREENBRIER DEVELOPMENT CO, LLC | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court is a "Motion for Judgment on the Pleadings with Respect to Greenbrier Development Company, LLC's Counterclaims for Tortious Interference with Contract and Civil Conspiracy and Its Claim for Punitive Damages."(R. #37) In its motion, declaratory plaintiff, CHRISTUS Health Southwestern Louisiana d/b/a CHRISTUS St. Patrick Hospital ("CHRISTUS") moves to dismiss defendant Greenbrier Development Co. LLC's ("Greenbrier") Count Two (for "Civil Conspiracy") and Count Three (for "Tortious Interference with Contract") of Greenbrier's counterclaim. CHRISTUS maintains that Greenbrier has failed to state a cause of action for which relief can be granted, and thus the claims must be dismissed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## ALLEGATIONS

The following allegations are made in the complaint[1] and the answer[2] which contains a counterclaim. CHRISTUS purchased certain property to develop a senior living community center

---

[1] R. #1.

[2] R. #5.

in Lake Charles, Louisiana; the community center was to be called "CHRISTUS Village – Lake Charles" (the "Project").[3] On or about May 10, 2007, CHRISTUS and Greenbrier entered into a Development Services Agreement (the "Agreement") to facilitate the development of the Project.[4]

The Agreement required Greenbrier to provide "Development Services" which included implementation of the development plan, revisions to the development plan, preparation of detailed budgets, identifying and assisting CHRISTUS St. Patrick in obtaining all necessary federal, state, and local permits and approvals, assisting the coordination of various design consultants, coordinating the submissions of architectural plans and specifications by the design consultants, assisting in securing permanent financing, assisting with the selection and engagement of the general contractor for construction, and providing market and financial data and performing feasibility studies as needed.[5]

Pursuant to that Agreement, Greenbrier was to be paid a development fee of $1,490,000 over a period of time as earned in various increments.[6] The Agreement was contingent upon permanent financing. The parties' understanding of where that financing would come from would be either internally through CHRISTUS capital or otherwise.[7] Section 7.1(a) & (b) of the Agreement permitted the parties to unilaterally terminate the Agreement upon 30 days prior written notice to the other party if there was a "(a) [f]ailure to obtain approval of the appropriate regulatory bodies or corporate

---

[3] R. #1, ¶ 9.

[4] Id. ¶ 10.

[5] Id. ¶ 11, and attached exhibit A, § 3.

[6] Id. § 5.1.

[7] R. #1 ¶ 13 and attached exhibit A, § 1.23.

2

approvals required for development, construction and financing of [the Project] on the site which is subject to the option or contract to purchase; or (b) [f]ailure to secure permanent financing for [the Project.]."[8] If either party elected to terminate the Agreement under this section, the parties would "have no further obligations to one another."[9] The Termination provisions of the Agreement further provided that if CHRISTUS terminated the Agreement "without cause and at any time within one (1) year of the termination date goes forwards with development of the Project, [CHRISTUS] will pay to [Greenbrier] any unpaid balance of the entire Development Fee."[10]

In early 2009, CHRISTUS learned that it would not receive financing from its partner company, CHRISTUS Health due to evolving financial projections and unanticipated capital limitations. CHRISTUS further learned that it would not receive authorizations from CHRISTUS Health to proceed with the development of the Project. Hence, in May 2009, CHRISTUS instructed Greenbrier to stop all work on the Project and did not authorize or request that Greenbrier do any additional work other than procuring alternative financing or seeking potential investors for the Project.[11]

During 2009 CHRISTUS requested that Greenbrier seek "outside" sources for additional financing of the Project, and/or to seek a buyer of certain Project assets of CHRISTUS to permit CHRISTUS to move forward with the Project as marketer and manager.[12] Greenbrier introduced

---

[8] Id. ¶14, and exhibit A, § 7.1 (a) & (b).

[9] Id.

[10] Id. ¶ 7.5.

[11] R. #1, ¶ 17 In their Answer, Greenbrier expressly denies this allegation.

[12] Greenbrier Answer and Counterclaim § III ¶ (6).

3

CHRISTUS to Glenn Stewart and his company GRS (hereinafter collectively referred to as "Stewart")[13]. Stewart and CHRISTUS agreed and represented to Greenbrier that if Stewart became involved in the Project, and regardless of the role ultimately assumed by CHRISTUS, Greenbrier would continue in the Project.[14] Greenbrier and Stewart also executed a Confidentiality/Non-Disclosure Agreement prior to any discussions with CHRISTUS, and CHRISTUS had been made aware that Greenbrier would continue as Developer of the Project should Stewart participate in the Project.[15]

On October 28, 2009, CHRISTUS sold its entire ownership interest in the Project, including its ownership in the land to Lake Charles Gardens, L.L.C. ("LCG") managed by Glenn R. Stewart.[16] In November 2009, CHRISTUS and Stewart had a "ground-breaking" for the Project; the further development of the Project did not include Greenbrier.[17] On December 17, 2009, CHRISTUS informed Geenbrier by letter that they were terminating the Agreement pursuant to § 7.1 (a) & (b) because CHRISTUS had failed to secure the appropriate corporate approvals for the development, construction and financing of the Project, and failed to secure permanent financing for the Project.[18] CHRISTUS asserts that the letter provides the required thirty (30) day notice to Greenbrier. As of

---

[13] Id.

[14] Id.

[15] Id.

[16] R. #1, ¶ 18 and Attached exhibit B.

[17] Greenbrier's Answer and Counterclaim, R. #5, § III, ¶ 7.

[18] R. #1, ¶ 19 and Attached exhibit C; R. #5, § III, ¶ 8.

that date, CHRISTUS had paid Greenbrier a total of $388,000.[19]

On June 28, 2011, Greenbrier commenced an arbitration proceeding against CHRISTUS asserting claims of breach of contract, civil conspiracy, and tortious interference with contract seeking to recover the remainder of the development fee allegedly due under the Agreement ($1,102,000) plus exemplary damages, costs and attorneys' fees.[20] Greenbrier contends that it commenced the arbitration proceeding at CHRISTUS' invitation. In the Arbitration Complaint, Greenbrier alleged that it had introduced Glenn R. Stewart and his companies to CHRISTUS as a potential source of additional financing for the Project.[21] Greenbrier further claimed that CHRISTUS and Stewart agreed that if Stewart became involved in the Project, Greenbrier would remain as the Developer.[22]

Greenbrier then alleged that after CHRISTUS "sold a portion" of its interest in the Project to Stewart, CHRISTUS continued to develop and construct the Project without Greenbrier's involvement.[23] Greenbrier complained that CHRISTUS breached the Agreement by failing to keep Greenbrier as the Developer of the Project, and CHRISTUS wrongfully terminated the Agreement "without cause" in December 2009.[24] Thus, Greenbrier alleged that because CHRISTUS wrongfully terminated the contract without cause and began construction of the Project within one month of

---

[19] Id. ¶ 20.

[20] Id. ¶ 21 and attached exhibit D.

[21] Id. ¶ 22 and attached exhibit D, ¶ 10.

[22] Id. ¶ 23 and attached exhibit D, ¶ 10.

[23] Id. ¶ 24 and attached exhibit D, ¶¶ 11, 13, and 14.

[24] Id. ¶ 25 and attached exhibit D, ¶ 16-19.

termination, Greenbrier was entitled to the remainder of the development fee, or $1,102,000.00.[25] Greenbrier relied on Section 7.5 of the Agreement which provides as follows:

> [I]n the event [CHRISTUS St. Patrick] terminates this Agreement without cause and at any time within one (1) year of the termination date goes forward with development of the Project, Owner will pay to Developer any unpaid balance of the entire Development Fee.[26]

Based on this provision, Greenbrier sought the remainder of the development fee alleging that CHRISTUS terminated the agreement without cause in December 2009 and began construction for the Project within one month of the termination.[27] Greenbrier also asserted claims of civil conspiracy and tortious interference with contract relating to certain representations and agreements alleged to have been made by Stewart to Greenbrier in connection with the Project.[28]

CHRISTUS denies that it had an agreement with Stewart to continue as the developer of the Project after CHRISTUS sold its interest in the Project to LCG. CHRISTUS denied that it wrongfully terminated the Agreement without cause.[29] CHRISTUS asserts that it sold its entire ownership interest to LCG and was no longer involved in the control or the development and construction of the Project.[30] Thus, CHRISTUS maintained that it was not liable for any additional monies under the Agreement, or otherwise.[31]

---

[25] Id. ¶ 26 and attached exhibit D, ¶ 16-19.

[26] Id. ¶ 27.

[27] Id. ¶ 27 and attached exhibit D, ¶¶ 16-19; exhibit A, § 7.5

[28] Id. ¶ 28, exhibit D, ¶¶ 20-23.

[29] Id. ¶ 30.

[30] Id. ¶ 31.

[31] Id. ¶ 32.

In the instant complaint, CHRISTUS first denies that the claims asserted by Greenbrier are subject to arbitration. CHRISTUS then seeks a ruling from this court that it properly terminated the Agreement under sections 7.1(a) & (b) because of its inability to secure financing and obtain corporate approval.

In its counterclaim, Greenbrier asserts a breach of contract claim against CHRISTUS because CHRISTUS went forward with the development of the Project and deliberately cut Greenbrier out of its role. Greenbrier further asserts a civil conspiracy claim against CHRISTUS and Stewart/GRS who conspired to cut Greenbrier out of its role as the developer for the Project, deny it the 35% "groundbreaking/construction" portion of the development fee already earned by Greenbrier, and denied Greenbrier its contractual right to perform duties as developer and earn the remainder of the development fee under the Agreement.

Finally, Greenbrier asserts a claim of tortious interference with contract against CHRISTUS in that CHRISTUS conspired with Stewart/GRS to persuade Stewart/GRS to breach its agreements with Greenbrier and to participate in the Project in such a fashion as to deny Greenbrier the role of developer as CHRISTUS went forward with the Project and to deliver the role of developer to CHRISTUS' co-conspirator Stewart/GRS causing Greenbrier a loss of the unpaid development fees in the amount of $1,102,000.00.

In response to Greenbrier filing an arbitration proceeding, CHRISTUS filed the instant declaratory proceeding seeking a declaration from this Court that (1) the claims of Greenbrier were not subject to arbitration under the terms of the Agreement, and (2) CHRISTUS properly terminated the Agreement.[32] Greenbrier ultimately elected not to proceed with the arbitration and that matter

---

[32] R. #1.

7

was closed as of September 27, 2011.

In the instant motion for judgment on the pleadings, CHRISTUS seeks to dismiss Greenbrier's claims of civil conspiracy, tortious interference with contract and punitive damages.

## RULE 12(C) STANDARD

The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss.[33] The court ""accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."[34] The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[35] "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[36]

*Tortious interference*

Greenbrier alleges that CHRISTUS intentionally interfered with a separate contract allegedly in place between Greenbrier and Glenn Stewart and/or his company, GRS Property Management ("GRS"). Pursuant to that contract, Greenbrier claims Stewart agreed to allow Greenbrier to remain as the developer of the Project. Neither Stewart nor GRS are parties to this lawsuit. CHRISTUS maintains that Louisiana law does not recognize a cause of action for Greenbrier's claim.

CHRISTUS relies on 9 to 5 Fashions, Inc. v. Spurney.[37] CHRISTUS argues that the Louisiana Supreme Court in Spurney recognizes only a very narrow and limited cause of action for tortious

---

[33] In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir 2007).

[34] Id.

[35] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007).

[36] Id. at 1965.

[37] 538 So.2d 228 (La.1989)

interference with a contract– specifically, only a claim made against a corporate officer defendant for tortiously interfering with a contract in existence between the corporate employee of that defendant and a plaintiff. In <u>Spurney</u>, the court recognized a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.[38] CHRISTUS cites numerous cases wherein it contends the courts have "recognized the extreme narrowness of Louisiana's tortious interference action and have denied all claims that do not fit within the narrow parameters of <u>Spurney</u>."[39]

CHRISTUS contends that the claim now asserted by Greenbrier against CHRISTUS falls short of the standard set forth in <u>Spurney</u> because Greenbrier's claim of tortious interference is against CHRISTUS and not against a corporate officer. CHRISTUS further contends that the contract alleged to have been tortiously interfered with is not the Agreement that was in place between CHRISTUS and Greenbrier, but a separate contract alleged to have existed between Greenbrier and Glenn Stewart and/or GRS, neither of whom are parties to the pending litigation.[40] Thus, CHRISTUS maintains that Greenbrier's claims of tortious interference must be dismissed

---

[38] For purposes of analysis, the Louisiana Supreme court recognized the following elements: "(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer." <u>Spurney,</u> 538 So.2d at 234.

[39] Plaintiff's memorandum p. 7.

[40] Citing <u>Matrix Essential, Inc. v. Emporium Drug Mart, Inc.,</u> 756 F. Supp. 280, 284 (W.D. La. 02/15/91)(The [Spurney] opinion recognized only an action wherein a corporate officer causes his own corporation to breach a contract between his own corporation and the plaintiff).

9

under Rule 12(c) for failure to state a claim upon which relief can be granted.

Greenbrier contends that a claim for tortious interference against a corporation is available and may be maintained in the face of a "no cause of action" challenge under Louisiana Law citing Neel v. Citrus Lands of Louisiana, Inc.[41] In reversing the lower court's dismissal of a tortious interference claim, the Neel court opined as follows:

> The trial court's reading of *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989) is too narrow. In *9 to 5 Fashions* the court reviewed the history of the Louisiana law on intentional interference with contractual relations. The court concluded that Louisiana's reluctance to entertain such claims was outmoded as well as being based on the faulty methodology of codal interpretation employed by the court in the landmark case of *Kline v. Eubanks*, 109 La. 241, 33 So. 211 (1902). The reasoning the court used in repudiating the line of cases spawned by *Kline v. Eubanks* is clearly of broader application than the narrow facts found in *9 to 5 Fashions*. The court said in *9 to 5 Fashions* that it recognized at that time "…only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." However, throughout the opinion there is the strong implication that the court recognized that the Louisiana law of intentional interference with contractual relationships should be far broader than the narrow facts before the court in *9 to 5 Fashions*, although less broad than the amorphous law of some jurisdictions that seemed insusceptible of definition and reasonable limitation.

The court ultimately concluded that Louisiana law permits a tortious interference claim against a corporation and not just its officers. Greenbrier further notes that in Neel, the court criticized Lynn v. Berg Mechanical, Inc.,[42] stating that:

> [i]t would have been more appropriate for the court in *Lynn v. Berg* to have found that the facts (which are very different from the instant case) did not warrant relief on the basis of intentional interference with contractual relationships rather than imply that the only such cause of action is the one involving a corporate officer meeting the precise criteria set forth in *9 to 5 Fashions, Inc.*[43]

---

[41] 629 So.2d 1299, 1301 (La.App. 4 Cir. 1993).

[42] 582 So.2d 902 (La.App. 2 Cir. 1991).

[43] Neel, 629 So.2d at 1301.

However, in Technical Control Systems, Inc.v . Green,[44] the court expressly disagreed with the Fourth Circuit ruling reasoning as follows:

> [W]e believe the thrust of the issue revolves around the distinction between contract and tort claims. In *Healthcare Management Services, Inc. v. Vantage Healthplan, Inc.,* 32,523, p.5 (La.App. 2 Cir. 12/8/99), 748 So.2d 580, 583, which we quoted with approval in *Spears v. American Legion Hospital,* 00-865 (La.App. 3 Cir. 1/31/01), 780 So.2d 493, the court stated:
>
>> The rule governing contract disputes and breaches are separate from those governing offenses and quasi offenses, and these separate legal domains should not overlap unless there is a duty on the part of a person or legal entity, separate and apart from the obligations created by the terms of a contract. Thus, in *Spurney,* an exception to the general prohibition against an action for interference with contract was found because the court recognized a duty on the part of a corporate officer to a third person having a contractual relationship with the corporation to which the officer owed a fiduciary duty.
>
> Thus, the tortious interference action against a corporate officer lies in those instances when imposing a tort duty is more appropriate due to the officer's actions. In an ordinary case, for example, where an officer breaches a contract for the benefit of his corporation and acts within his authority, the corporation, the party with whom the plaintiff has contracted, would be liable in contract, not tort. We believe that tort actions against corporate entity defendants should be curtailed when a more appropriate breach of contract action is available. As Professors Morris and Holmes explain:
>
>> While contract and tort arguments are often made in the alternative, a rejection of the contract argument (or a failure by one of the parties to make such an argument), followed by an acceptance of the tort argument necessarily means that the court is imposing some legal duty on the parties that the court has found not to be a part of their agreement, either expressly or tacitly. Rarely will such a judicially-imposed modification of the contract be justified in dealing with the purely commercial relations between the contracting parties themselves.[45]

---

[44] 809 So.2d 1204, 1208 (La.App. 3 Cir. 2002).

[45] BUSINESS ASSOCIATIONS, § 33.11 at 142, n.3.

The Third Circuit, relied on a Louisiana Supreme Court ruling that reversed the Third Circuit's own ruling which attempted to expand claims of tortious interference against a non-corporate officer who was not a corporate entity,[46] as well as other cases wherein it declined to extend the doctrine beyond the limitations set forth in Spurney.[47]

The court finds that the Third Circuit's reasoning is well founded, and we conclude that the doctrine of tortious interference with contract should not be expanded beyond the limitations set forth in Spurney. Thus, plaintiff's claims properly lie in contract and not in tort. Accordingly, the claims of tortious interference with contract shall be dismissed.

*Civil conspiracy claim/punitive damages*

Greenbrier alleges that CHRISTUS and Stewart/GRS conspired to cut Greenbrier out of its role as developer for the Project causing Greenbrier a loss of a 35% "groundbreaking/construction" portion of the developer fee. Additionally, CHRISTUS denied Greenbrier its contractual right to perform duties as developer and earn the remaining developer fee. Greenbrier alleges that CHRISTUS promised Greenbrier that it would continue as developer for the Project even if Stewart/GRS agreed to participate. Thereafter, CHRISTUS and Stewart/GRS entered into an

---

[46] See Cowen v. Steiner, 689 So.2d 516(La.App. 3 Cir. 1/22/97), rev'd, 701 So.2d 140 (La. 9/19/977), citing with approval Guilbeaux v. Times of Acadiana, Inc., 693 So.2d 1183, (La.App. 3 Cir. 03/26/97), writ denied, 701 So.2d 1327(La. 10/17/97)( for the proposition that Spurney need not be limited to corporate officer defendants).

[47] See White v. White, 641 So.2d 538 (La.App. 3 Cir. 6/15/64), writs denied, 648 So.2d 402 (La.12/19/94) (no cause of action for tortious interference with contract where the defendant was not a corporate officer); Accredited Sur. and Cas. Co. v. McElveen, 631 So.2d 563 (La.App. 3 Cir. 2/2/94) , writ denied, 637 So.2d 483 (La.5/20/94), cert. denied, 513 U.S. 963, 115 S.Ct. 424 (1994)(no expansion of *Spurnery* to non-corporate officers); Spears v. American Legion Hospital, 780 So.2d 493 (La.App. 3 Cir. 2/27/02)(no cause of action when defendant is not a corporate officer).

Agreement to go forward with the Project, cut Greenbrier out and cause Greenbrier a loss of unearned development fees under the CHRISTUS/Greenbrier Agreement.[48] Greenbrier maintains that its claim for tortious interference against CHRISTUS provides the underlying tort claim to support the basis for the conspiracy claim against CHRISTUS.

CHRISTUS maintains that plaintiff's claims of civil conspiracy must fail because the only underlying tort claim (tortious interference with contract) upon which the conspiracy claim could be based fails as a matter of law. As noted by CHRISTUS, Louisiana law does not recognize an independent cause of action for "civil conspiracy."[49] The actionable element in a conspiracy claim is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part.[50]

The court agrees with CHRISTUS that because the claim for tortious interference with contracts claim fails, Greenbrier's claim for civil conspiracy likewise fails. Furthermore, Greenbrier's claim for an award of punitive or exemplary damages in connection with its claim for civil conspiracy must fail because it is not authorized by statute.[51]

## CONCLUSION

---

[48] Greenbrier's counterclaim, ¶¶ 16 & 17. R. #5.

[49] Jefferson v. Lead Indus. Ass'n, Inc., 930 F.Supp. 241, 247 (E.D. La. 1996).

[50] New Orleans Jazz and Heritage Foundation, Inc. v. Kirksey, 40 So.3d 394, 408 (La.App. 4 Cir. 5/26/10); Ross v. Conoco, Inc., 828 So.2d 546, 552 (La.10/15/02). See also Crutcher-Tufts Resources, Inc. v. Tufts, 38 So.3d 987, 991 (La.App. 4 Cir. 4/28/10); Tepsic v. National R.R. Passenger Corp., 1995 WL 448010 *1 (E.D.La.1995); Rhyce v. Martin, 173 F.Supp.2d 521, 535 (E.D.La.2001).

[51] See Ross, 828 So.2d at 555 (La. 10/15/02); Pappion v. Dow Chemical Co., 594 F.Supp. 428, 432 (W.D. La.1984).

For the reasons set forth above, the motion for judgment on the pleadings will be granted dismissing with prejudice Greenbrier's claims for tortious interference of contract, civil conspiracy and punitive/exemplary damages.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 4th day of June, 2014.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE