RECEIVED
IN ALEXANDRIA, LA.
JUN 1 0 2014
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| CHRISTUS HEALTH SOUTHWESTERN LOUISIANA D/B/A CHRISTUS ST. PATRICK HOSPITAL | : | DOCKET NO. 2:11-1334 |
| VS. | : | JUDGE TRIMBLE |
| GREENBRIER DEVELOPMENT COMPANY, LLC | : | MAGISTRATE JUDGE KAY |

<u>MEMORANDUM RULING</u>

Before the court is "Defendant/Counter claimant Greenbrier Development Company, LLC's Motion for Partial Summary Judgment" (R. #38) wherein the mover seeks a ruling from this court that plaintiff, CHRISTUS Health Southwestern Louisiana d/b/a CHRISTUS St. Patrick Hospital (collectively referred to as "CHRISTUS") breached its contract with Greenbrier Development Company, LLC ("Greenbrier") entitling Greenbrier to $1,102,000 in damages. Also before the court is a "Motion for Partial Summary Judgment with Respect to Count Two of the Complaint for Declaratory Judgment filed by CHRISTUS Health Southwestern Louisiana d/b/a Christus St. Patrick Hospital" (R. #39) wherein CHRISTUS seeks a declaration from this court that it properly terminated the Development Services Agreement ( the "Agreement") with Greenbrier pursuant to Section 7.1(a) & (b) of the Agreement. Due to the intertwining issues, the court will address both motions in this ruling.

Because the arbitration proceeding has been voluntarily dismissed by Greenbrier, the court will dismiss as moot, CHRISTUS' request for a declaration that the claims asserted in the arbitration proceeding are outside the scope of the arbitration provision in the Agreement.

## FACTUAL STATEMENT

On or about May 10, 2007, CHRISTUS and Greenbrier entered into a Development Services Agreement (the "Agreement") to facilitate the development, ownership and construction of a senior living community center contemplated to be built by CHRISTUS and named CHRISTUS Village Lake Charles (the "Project").[1] The entire Development Fee to be paid to Greenbrier was $1,490,000; CHRISTUS paid Greenbrier $388,000. There is no dispute that Greenbrier performed well under the Agreement. CHRISTUS terminated the Agreement via letter dated December 17, 2009.[2] The letter provided 30 days notice that the Agreement would terminate in accordance with Section 7.1(a) & (b) of the Agreement.[3] Subsequently, Greenbrier made demand for payment of the remaining $1,102,000 of the Development Fee. CHRISTUS refused to make any further payments to Greenbrier.

Section 7.1(a) and (b) of the Agreement provides that either party may terminate the Agreement upon 30 days prior written notice to the other party for the following two reasons:

    (a)    [f]ailure to obtain approval of the appropriate regulatory bodies or corporate approvals required for development, construction and financing of the Community on the site which is the subject to the option or contract to purchase; or

    (b)    [f]ailure to secure Permanent Financing for the Community.[4]

---

[1] CHRISTUS exhibit 1-1.

[2] CHRISTUS Statements of Material Fact #11 and 12.

[3] CHRISTUS exhibit no. 1-3, p. 16.

[4] CHRISTUS exhibit no. 1-1, p. 14.

CHRISTUS[5] maintains that it was unable to secure permanent financing for the Project from CHRISTUS Health or the CHRISTUS Health System, nor was it able to secure permanent financing for the Project from any other source.[6] Thus, CHRISTUS did not receive the required authorizations and approvals from its parent company, CHRISTUS Health, to proceed with the development, construction and financing of the Project.

Greenbrier, on the other hand, contends that the termination of the Agreement, was "without cause" and that CHRISTUS moved forward with the development of the Project in violation of ¶ 7.5 of the Agreement which is as follows:

> In the event this Agreement is terminated for any reasons other than for reasons enumerated in Section 7.3,[7] Owner will pay to Developer the amount of any unpaid

---

[5] CHRISTUS St. Patrick is a wholly owned, non-profit subsidiary of CHRISTUS Health, a corporate entity that manages and operates the CHRISTUS Health System, consisting of more than 40 hospitals and facilities located in 6 American states and Mexico.

[6] "Permanent Financing" is defined in the Agreement to mean "...the long-term debt structure to fund the costs of acquisition, development, construction and start-up of the Community [Project] which is proposed to be repaid from future operating revenues of the Community." CHRISTUS exhibit no.1-1, p. 4.

[7] § 7.3 is as follows:

Owner may also terminate this Agreement upon the occurrence of the following circumstances;

> (a) if Developer has materially failed to perform any of its obligations under this Agreement, Owner shall give Developer written notice specifying the respects in which Developer has materially failed to perform; and

> (b) if Developer fails to cure a material failure within thirty (30) days after written notice thereof (or in the case of a failure which cannot by its nature be cured within a period of thirty (30) days after notice thereof, Developer does not commence to cure such failure within ten (10) days following notice thereof and Developer does not diligently proceed to effect such cure), Owner shall have the right to terminate this Agreement by giving Developer written notice thereof.

portion of the Development Fee due prior to the date of termination according to the schedule of payment in Section 5.1, together with all Reimbursable Expenses incurred by Developer prior to the date of termination which have not been paid prior to the date of termination. Notwithstanding the foregoing, in the event Owner terminates this Agreement without cause and at any time within one (1) year of the termination date goes forward with development of the Project, Owner will pay to Developer any unpaid balance of the entire Development Fee.[8]

Greenbrier maintains that CHRISTUS proceeded to immediately move forward with the development of the Project by entering into contracts with Glenn Stewart and/or his company Lake Charles Gardens, LLC ("LCG") assuming the role of "Developer" and "Manager." Additionally, CHRISTUS marketed the Project under the same name (CHRISTUS Village Lake Charles) and constructed on the same land. Greenbrier complains that CHRISTUS displaced Greenbrier as developer before it terminated the Agreement. Thus, Greenbrier argues that because CHRISTUS violated ¶ 7.5 of the Agreement, Greenbrier is entitled to the remainder of the developer fee–$1,102,000.

## PROCEDURAL HISTORY

In May of 2009, after learning that neither CHRISTUS Health, nor the CHRISTUS Health System would finance or approve the CHRISTUS Village Lake Charles Project, CHRISTUS instructed Greenbrier to stop work on the Project. As part of its obligation under the Agreement, Greenbrier sought alternative sources for permanent financing for the Project, one of whom was Glenn Stewart, owner and manager of LCG. On October 28, 2009, CHRISTUS sold its ownership interest in the Project to LCG.[9] On November 2, 2009, CHRISTUS announced that the "groundbreaking" of the Project would take place on or about November 19, 2009; the

---

[8] Greenbrier exhibit A, ¶ 7.5, R. #38-4.

[9] Exhibit B, attached to Complaint, R. #1.

4

groundbreaking did in fact take place, but without Greenbrier. On December 17, 2009, CHRISTUS, via letter, gave Greenbrier (30) days notice that it was unilaterally terminating the Agreement in accordance with Sections 7.1 (a) and (b).[10]

Greenbrier made demand upon CHRISTUS seeking the unpaid balance of the entire Development Fee. CHRISTUS refused the demand and expressly invited Greenbrier to seek arbitration.[11] Consequently, on June 28, 2011, Greenbrier commenced an arbitration proceeding against CHRISTUS asserting claims for breach of contract, civil conspiracy, and tortious interference with contract.[12] In response to the arbitration proceeding, CHRISTUS filed the instant declaratory action seeking to have this court declare that CHRISTUS properly terminated the Agreement between the parties pursuant to Sections 7.1(a)( & (b). In this declaratory action CHRISTUS also seeks to have the court declare that the dispute is not arbitrable. Greenbrier ultimately dismissed the arbitration proceeding.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[13] A fact is "material" if its existence or

---

[10] Exhibit C, attached to Complaint, R. #1.

[11] Greenbrier App. Ex. C; Hecht depo., p. 174:20-25 and p. 175;1-24.

[12] Exhibit D attached to Complaint, R. #1.

[13] Fed. R.Civ. P. 56(c).

nonexistence "might affect the outcome of the suit under governing law."[14]  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[15] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[16]  Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[17]  The burden requires more than mere allegations or denials of the adverse party's pleadings.  The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[18]  There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[19]  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[20]

## LAW AND ANALYSIS

In its motion for partial summary judgment, CHRISTUS seeks judgment as a matter of law that it properly terminated the Agreement with Greenbrier pursuant to § 7.1(a) & (b). CHRISTUS

---

[14] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

[15] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).

[16] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).

[17] Anderson, 477 U.S. at 249.

[18] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[19] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

[20] Anderson, 477 U.S. at 249-50.

further relies on § 1.23 of the Agreement which provides that "Permanent Financing may be achieved using internal CHRISTUS CAPITAL" and § 3.9 which provides that "[t]he Development Plan indicates that the primary source of Permanent Financing for the Community is internal CHRISTUS capital."[21] CHRISTUS has provided summary judgment evidence that it was unable to locate or obtain any other source of permanent financing for the Project and that CHRISTUS Health ultimately withdrew its corporate approval and authorization for CHRISTUS to proceed with the development, construction and financing of the Community Project.[22]  CHRISTUS then sold its entire ownership interest in the Project to a third party, albeit procured by Greenbrier, to LCG which was managed by Glenn Stewart.[23]

CHRISTUS argues that because it was unable to secure permanent financing, and unable to get corporate approval, it properly terminated the agreement by letter dated December 17, 2009.

Greenbrier first seeks to have this court deny CHRISTUS' motion for lack of subject matter jurisdiction arguing that the declaration sought is not relevant to the "case or controversy" and would not resolve the parties' dispute. The Federal Declaratory Judgment Act provides:

> (a)   In a case of actual controversy within its jurisdiction, ... any court of the United States, ... , may declare the rights and other legal relations of an interested party seeking such declaration, whether or not further relief is or could be sought.[24]

As noted by Greenbrier, we must determine (1) whether the declaratory action is justiciable;

---

[21] CHRISTUS exhibit 1-1. p. 4.

[22] CHRISTUS exhibit no. 1, Bill Hecht affidavit pp. 2-3.

[23] CHRISTUS exhibit No. 1-2, Cash Sale between CHRISTUS and LCG.

[24] 28 U.S.C. § 2201.

(2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise discretion to decide or dismiss the action.[25] The Declaratory Act has its limits.

> A justiciable controversy is ... distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a *conclusive* character; as distinguished from an opinion advising what the law would be...[26]

Greenbrier maintains that even if the court declared that CHRISTUS properly terminated the agreement, it would not resolve the breach of contract claims asserted by Greenbrier in its counterclaim. Greenbrier asserts that the issue in this case is whether it is entitled to the remainder of the Development Fee because CHRISTUS terminated the Agreement without cause and then moved forward with developing the Project within the one year restricted period.

CHRISTUS maintains that it terminated the Agreement for cause. Specifically, it failed to obtain corporate approval and permanent financing. Additionally, CHRISTUS maintains that it sold all of its interests in the land and was not the developer of the Project after the sale to LCG.

An actual controversy exists where "a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests."[27] If no actual controversy exists, then this court lacks subject matter jurisdiction.[28] CHRISTUS filed the instant declaratory action in

---

[25] Orix Credit Alliance, Inc. v. Wolfe, 212 F.3d 891, 895 (5th Cir. 2000).

[26] Rowan Companies, Inc. v. Griffin, 876 F.2d 26, 27-28 (5th Cir. 1989)(quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-41, 57 S.Ct. 461, 463-64 (1937)(citations omitted, emphasis added); see also 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2757 (1983).

[27] Middle South Energy, Inc. v. City of New Orleans, 800 F.2d 488, 490 (5th Cir. 1986).

[28] Orix Credit Alliance, Inc. v. Wolfe, 212 F.3d 891 (5th Cir. 2000).

response to Greenbrier commencing an arbitration proceeding against CHRISTUS for a breach of contract claim. "There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred."[29] There is no doubt that the acts alleged to potentially create liability have already occurred. CHRISTUS terminated the Agreement and according to Greenbrier, moved forward with the development of the Project. The threat of litigation, if specific and concrete, can indeed establish a controversy upon which declaratory judgment can be based.[30] Therefore, we cannot say that there is no actionable or "justiciable" issue.[31] The actions complained of have already occurred and after unsuccessfully making demand for payment of the remaining Development Fee, Greenbrier commenced an arbitration proceeding against CHRISTUS.

Greenbrier maintains that even if subject matter jurisdiction is found, the court should exercise its discretion and decline to rule on the requested declaratory judgment action. The Declaratory Judgment Act,[32] "is an enabling act, which confers discretion on the courts rather than an absolute right on a litigant."[33] Federal District courts have considerable discretion in entertaining such requests and have substantial discretion in deciding whether to declare the rights of litigants."[34]

---

[29] 10B Charles A. Wright, et al, FEDERAL PRACTICE AND PROCEDURE § 2757 at 476 (1984).

[30] See NUCOR Corp. v. Aceros y Maquilas de Occidente, 28 F.3d 52, 578 (7th Cir. 1994).

[31] The requirement of an actual justiciable controversy is necessary to satisfy the constitutional limitations on the judicial power. Id.

[32] 28 U.S.C. § 2201(a).

[33] Wilton v. Seven Falls Co., 515 U.S. 277, 287, 115 S.Ct. 2137, 2143 (1995)(quoting Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241, 73 S.Ct. 236, 239 (1952)).

[34] Wilton, 515 U.S. at 286, 115 S.Ct. at 2142.

Greenbrier argues that CHRISTUS' second count for declaratory judgment[35] is simply a restatement in the negative of Greenbrier's first-in-time-filed claim in arbitration that Greenbrier is entitled to payment of the full Development Fee. Greenbrier remarks that a ruling from this court determining if CHRISTUS properly terminated the Agreement would not resolve the dispute over the Development Fee under Section 7.5 of the Agreement– that CHRISTUS moved forward with the development of the Project within the one year period after terminating the Agreement without cause.

The court is of the opinion that determining whether or not CHRISTUS properly terminated the agreement in accordance with § 7.1 (a) and (b) is relevant to the ultimate resolution of the instant case. Section 7.1 permits CHRISTUS to properly terminate the agreement if it cannot get corporate approval *or* it cannot procure permanent financing. This provisions releases CHRISTUS from any further obligations under the contract. Greenbrier has failed to submit any summary judgment to dispute the fact that CHRISTUS could not get the necessary corporate approval and/or permanent financing. Thus, there is no genuine issue of fact for trial and CHRISTUS is entitled to judgment as a matter of law that it properly terminated the Agreement.

In its motion for partial summary judgment, Greenbrier maintains that there is no genuine issue of material fact that plaintiff, CHRISTUS Health Southwestern Louisiana d/b/a Christus St. Patrick Hospital terminated the parties' Agreement regarding the development of the Project without cause on or about November 19, 2009 and, within one year of the termination date, went "forward with the development of the Project." There is no dispute that CHRISTUS had no complaints with

---

[35] CHRISTUS' first count was whether or not Greenbrier's proceeding in arbitration fell outside the scope of the Arbitration Complaint, and thus was not arbitrable. That count is now moot because Greenbrier has since voluntarily dismissed the arbitration proceeding.

Greenbrier's performance as developer under the Agreement. Greenbrier argues that after the sale of the Project and/or land to LCG, CHRISTUS immediately moved forward with the development of the project by entering into contracts and assuming the roles of "Developer" and "manager" of the Project which was marketed under the same name as the facility contemplated under the Greenbrier/CHRISTUS Agreement and was constructed on the same land.[36] Thus, Greenbrier maintains that it is entitled to the remainder of the Development Fee and entitled to judgment as a matter of law for actual damages of $1,102,000.

Under the Greenbrier/CHRISTUS Agreement, Greenbrier was obligated to provide "Development Services"[37] as follows: (1) implementation of development plan, (2) revisions to development plan, (3) preparation of detailed budgets, (4) government approvals, (5) design and engineering, (6) review architectural plans and specifications, (7) develop a program for resident services and activities, (8) assist with resident marketing program, (9) assist with permanent financing,[38] (10) assist with construction, and (11) assist with accounting and financial

---

[36] Greenbrier further complains that CHRISTUS moved forward with the project prior to terminating the Agreement with Greenbrier.

[37] "Development Services" is defined as all the services described in § 3 to be provided by developer in connection with planning, financing (if needed) and construction of the Community."

[38] As to assistance in securing permanent financing, § 3.9 provides as follows:

> The Development Plan indicates that the primary source of Permanent Financing for the Community is internal CHRISTUS capital. However, in the event requested by Owner, Developer shall provide services to assist Owner in securing Permanent Financing or an alternative source of Permanent Financing for the Community should that form of financing become necessary. In such case Developer will work with Owner to refine the plan of finance and evaluate alternatives to create an optimal capital structure. Developer will assist Owner in obtaining outside capital as necessary and prudent.

management.[39]

As noted by Greenbrier, the Agreement provided that if CHRISTUS terminated the Agreement "without cause and at any time within one (1) year of the termination date goes forward with development of the Project, [CHRISTUS] will pay to [Greenbrier] any unpaid balance of the entire Development Fee."[40] During 2009, CHRISTUS requested and approved efforts by Greenbrier to seek "alternative" sources of permanent financing for the Project and/or to seek a buyer of certain Project assets to permit CHRISTUS to move forward with the Project.[41] In response to CHRISTUS' request and as part of its obligations under the Agreement, Greenbrier introduced Glenn Stewart to CHRISTUS as an alternate means of financing[42] and further scheduled site inspections and meetings to discuss Stewart's potential involvement.[43]

In October 2009, prior to terminating the Agreement, CHRISTUS sold the land on which the Project was to be built to Stewart/LCG and also entered into two separate contracts with Stewart and his related entity LCG.[44] The Retirement Center Sales and Marketing Agreement, drafted by CHRISTUS, specifically identified CHRISTUS as "Developer" on the CHRISTUS Village Lake

---

[39] CHRISTUS exhibit 1-1, R. #39-8.

[40] Id. at § 7.5.

[41] Greenbrier App. Ex. B; Huff depo. at p. 73:24-25, p. 74:1-24, p. 98:5-8; p. 103:17-24; App.Ex. C, Hecht Depo. p. 167:12-25, p. 168:1-25; p. 169:1-4; p. 158:15-25; p. 159:1-9; App. Ex. D, Jones depo. p. 82:22-25.

[42] Greenbrier App. Ex. B, Huff depo. p. 76:25, p. 77:1-18, p. 78:14-17; App. Ex. C, Hecht depo. p. 158:15-25, p. 159:1-9, p. 148:1-14.

[43] Greenbrier App. Ex. B, Huff depo. p. 78:14-25, p. 79:1-23, Ex. 4 to Huff depo.; Greenbrier App. Ex. C, § 3.9; Hecht depo. p. 158:15-25, p. 159:1-9.

[44] Greenbrier App. B, Huff depo. P. 141:11-22, Exs. 9 and 11 to Huff/Hecht/Jones depos.

Charles Project.[45] The second agreement identified CHRISTUS as "Manager" of the Project.[46]

On November 2, 2009, CHRISTUS announced that the groundbreaking for the project was to be on November 19, 2009; the groundbreaking was held on that date, but Greenbrier was not invited.[47] After learning of Stewart being involved in the Project, Greenbrier's President, Mike Gilliam attempted without success to contact CHRISTUS as to its anticipated role in the Project. Thereafter, on December 17, 2009 Greenbrier received a letter from Bill Hecht, CFO of CHRISTUS giving notice of termination of the Agreement.

First, Greenbrier maintains that CHRISTUS' unilateral termination of the Agreement was "without cause" because it is undisputed that CHRISTUS had no basis for terminating the agreement with respect to Greenbrier's performance under the Agreement. Greenbrier relies on Black's Law Dictionary which defines "cause" as "[t]o be the cause or occasion of; to effect as an agent; to bring about; to bring into existence; to make to induce; to compel."[48]

CHRISTUS maintains that the termination was "for cause" because it was unable to get permanent financing and corporate approval relying on § 7.1 (a) & (b). Greenbrier contends that this argument is without support. Greenbrier points to § 7.2 which provides the circumstances where Greenbrier could terminate based on certain enumerated failures of CHRISTUS and § 7.3 sets out the circumstances under which CHRISTUS could terminate based on certain enumerated failures

---

[45] Greenbrier App. Ex. B; Huff depo. P. 141:11-22.

[46] Id., exhibit 11, p. 1.

[47] Greenbrier App. Ex. B; Huff depo. P. 162:9-14; App. Ex. C, Hecht depo. P. 142:1-14; Exhibit 10 to Huff/Hecht/ Jones depos.; exhibit 15 to Huf/ Hecht/Jones depos.

[48] Black's Law Dictionary, p. 221 (Sixth Edition, 1991).

of Greenbrier. Greenbrier remarks that none of the enumerated "causes" were expressed in the termination letter from CHRISTUS to Greenbrier. Greenbrier argues that the termination could not have been "for cause" because the two events to which CHRISTUS points as "triggers" were events solely under the control of CHRISTUS and/or its corporate parent.

CHRISTUS maintains that it terminated the agreement "for cause" upon the occurrence of certain events specified in the Agreement and it did not go "forward with the development of the Project," as that term was understood pursuant to the plain language of the Agreement. CHRISTUS relied on § 7.1 of the Agreement which allowed the parties to terminate the contract under certain conditions: (1) failure to obtain of the appropriate regulatory bodies or corporate approvals required for development, construction and financing, or (2) failure to secure permanent financing. CHRISTUS submits the affidavit of Bill Hecht who declares that CHRISTUS was unable to secure permanent financing from its parent company or from any other source.[49] Likewise, CHRISTUS did not receive the required authorizations and approvals from its parent company to proceed with the development, construction and financing of the Project.

Greenbrier notes that "for cause" is not defined in the Agreement, but it was understood that termination "for cause" is a termination that occurs as a result of a party's material breach of an agreement. Greenbrier remarks that it is undisputed that CHRISTUS' termination of the Agreement was not due to a material breach or fault by Greenbrier. Greenbrier refers the court to § 7.1 which provides that "...this Agreement *may* be terminated by either [Party] in the event of failure to obtain corporate approvals or secure Permanent Financing."[50] Greenbrier contends that CHRISTUS'

---

[49] CHRISTUS exhibit no. 6, ¶ 9, p. 3.

[50] (emphasis added).

14

termination was an elective "termination for convenience" due to an alleged change in financial circumstances of its parent corporation. Thus, because the termination was not "for cause" or in other words, a failure of Greenbrier to perform its obligations under the Agreement, § 7.5 applies to the termination of the Agreement which expressly prohibits CHRISTUS from further developing the property for a one year period after terminating the Agreement.

We previously concluded that CHRISTUS properly terminated the agreement because it was unable to get permanent financing and corporate approval. Pursuant to § 7.1, if CHRISTUS terminated the Agreement because of either of these events, CHRISTUS had no further obligations under the Agreement. Therefore, we further find that CHRISTUS' termination was "for cause." Thus, we must conclude that § 7.5 is inapplicable; hence, CHRISTUS cannot be liable for the remainder of the Development Fee. Accordingly, the court will deny Greenbrier's motion for partial summary judgment and grant CHRISTUS' motion for partial summary judgment.

## CONCLUSION

For the reasons set forth above the motion for partial summary judgment filed by Greenbrier will be denied and the motion for partial summary judgment filed by CHRISTUS will be granted as the court finds that CHRISTUS properly terminated the Agreement and owes no further obligations to Greenbrier under said Agreement.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 10th day of June, 2014.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE